HOUSEKEEPER PUB. CO. v. SWIFT et al.

(Circuit Court of Appeals, Eighth Circuit. October 16, 1899.)

No. 1,224.

1. CONTRACTS—ABROGATION BY NEW CONTRACT.

The legal effect of a subsequent contract completely covering the same subject-matter, and made by the same parties, as an earlier agreement, but containing terms inconsistent therewith, so that the two cannot stand together, is to rescind and supersede the earlier contract, and to constitute itself the only agreement of the parties on the subject.

**2. SAME—CONSTRUCTION—IMPEACHMENT OF EXECUTED AGREEMENT.**

A written contract for the sale and purchase of property, which has been fully executed by the delivery of the property and the payment of the price in accordance with its terms, cannot be impeached and set aside by the seller, and an earlier contract between the parties for the sale of the same property for a greater price substituted and enforced, merely on allegations of an oral understanding between them that the second contract should be without legal effect, and that payment should be made in accordance with the first, neither fraud nor mistake being charged.

**3. SAME—EVIDENCE OF NEGOTIATIONS.**

Evidence to sustain such allegations would be inadmissible, under the rule that previous parol negotiations are merged in a written contract, and cannot be shown to contradict its plain terms.

**4. SAME—PRACTICAL CONSTRUCTION BY PARTIES.**

The consummation of a sale in accordance with the terms of a written contract therefor between the parties is a practical construction which constitutes strong evidence that such contract embodied the true agreement.

In Error to the Circuit Court of the United States for the District of Minnesota.

This is an action to recover $25,000 and interest, which is the alleged balance of the purchase price of a printing and publishing plant, and of the good will of the business of publishing a newspaper. The plaintiff in error, the Housekeeper Publishing Company, a corporation, conveyed this plant and good will to the wives of the defendants in error, Lucian Swift and William E. Haskell, and received $25,000 for them. The vendor insists that it made this conveyance in performance of a contract which it made with the defendants through Frederick Fayram, one of their number, on June 14, 1895, to sell them this property for $50,000; and the defendants contend that the conveyances were made in the performance of a contract made by the plaintiff with the defendant Haskell on July 22, 1895, to sell the property for $25,000. The facts are set forth in the complaint. The court below deemed them insufficient to constitute a cause of action, sustained a demurrer to the complaint, and dismissed the suit. These are the alleged facts:

The plaintiff owned a printing plant, and the good will of the business of publishing a newspaper, subject to a mortgage of $50,000, which secured 250 bonds, upon some of which the interest was overdue. The defendant Fayram was authorized to, and did, act for the defendants, who were negotiating to purchase this property. On June 11, 1895, the plaintiff caused the following letter, which was signed by its president, George F. Jackson, to be delivered to Fayram:

"Minneapolis, Minn., June 11, 1895.

"Frederick Fayram, St. Paul, Minn.—Sir: In accordance with the several conversations I have had with you, I hereby agree, on receipt of a written proposition from you offering to buy the plant, property, and good will of the Housekeeper Publishing Company, and to pay therefor the sum of fifty thousand dollars ($50,000), not less than twenty-five thousand dollars to be paid in cash, and the balance by notes payable in four, eight, and twelve months, with interest at six per cent. per annum, to use every personal endeavor to consummate the sale and deliver the property into your hands within as short a time as possible after receipt of aforesaid proposition.

"[Signed]                                   George F. Jackson, Prest."

On June 14, 1895, Fayram delivered to the plaintiff a written acceptance of the proposition contained in this letter, in which he agreed to buy the property, and to pay for it $25,000 in cash, and three promissory notes of defendants, of $8,333.30 each. The plaintiff orally notified the defendants that it would accept this proposition. During the negotiation it was agreed that the title should be approved by the attorneys of the defendants. On June 17, 1895, the defendants notified the plaintiff that their attorneys required, and they

demanded, that the title to the property should be transferred to them through a foreclosure of the mortgage on the plant, and they also insisted that their written acceptance and agreement to pay $50,000 for the property should be returned and surrendered to them. They gave as a reason why they required a surrender of this acceptance that, if such a contract of purchase should come to the knowledge of the plaintiff's creditors, a charge of collusion might be made against the plaintiff and the defendants, in connection with the foreclosure of the mortgage. They assured the plaintiff that they would take the property as theretofore agreed, contract or no contract, that they intended to and would carry out their agreement, that they did not desire to cancel or modify the contract, and that the only purpose upon their part of having the custody of the written agreement was to insure against the hazard of its becoming an evidence of collusion in any attack on the foreclosure. The plaintiff believed these assurances, and surrendered the written acceptance and agreement. It then caused the mortgage upon this property to be foreclosed, and caused the title under the foreclosure to be vested in its attorney, Mr. C. W. Tankersley. While the foreclosure proceedings were pending, and after the agreement had been surrendered, the defendants again assured the plaintiff that they were willing, ready, and anxious to buy the property, and to pay for it $25,000 in cash and $25,000 in their notes. Before the foreclosure sale, which was made on July 6, 1895, they advised the plaintiff that seeming negotiations should be carried on between them after the foreclosure was completed, relative to the sale of the property; but they assured the plaintiff at all times that the only contract and transaction they desired to make was that made between the plaintiff and Fayram, and that all subsequent apparent transactions should be without meaning or validity, except as a method of transferring the title. In pursuance of this plan, simulated negotiations were conducted, and on July 22, 1895, the defendant Haskell wrote and delivered this letter:

"Minneapolis, Minn., July 22, 1895.

"Mr. George F. Jackson, Minneapolis, Minn.—Dear Sir: I will pay, or cause to be paid, the sum of $25,000 for the transfer to me, or to such person or persons or corporation as I may name, of the absolute title to the following described property, free and clear of all incumbrances, except as hereinafter specified, to wit: All the property described in the certain mortgage made on October 31st, 1891, by the Buckeye Publishing Company to L. Parker Veazey, as trustee, which mortgage was filed in the office of the city clerk of the city of Minneapolis on December 23rd, 1891, subject, however, to certain mortgages on two Huber presses. This offer is made upon the following conditions: (1) Title shall be examined by Kitchel, Cohen & Shaw, and shall not be taken unless they certify that it is satisfactory to them. (2) This offer shall hold good until 12 o'clock noon of the 23rd day of July, 1895, and no longer.        Yours, truly,                    W. E. Haskell."

George F. Jackson, as the complaint reads, "for the purpose of performing the plaintiff's original contract, and not otherwise, pretended personally and orally, and not otherwise, to accept, in form, the offer of said Haskell; and on July 26th thereafter formal instruments of conveyance and transfer of all said properties were executed both by plaintiff and said Tankersley in part performance of the contract of June 14th, and not otherwise." Twenty-five thousand dollars was paid for these conveyances. The bonds were surrendered to the defendants. On September 1, 1895, the president of the plaintiff left the city where the transactions were had, and did not return until October 25, 1895. On this day the plaintiff was advised for the first time that the defendants repudiated and denied the contract of June 14th, and they have ever since asserted that the negotiations between Jackson and Haskell in July constituted the contract between the parties. No demand was ever made for the promissory notes until about October 25, 1895.

Francis B. Hart, for plaintiff in error.

Emanuel Cohen (Stanley R. Kitchel and Frank W. Shaw, on the brief), for defendants in error.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

SANBORN, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

This is an action on a contract. The plaintiff has sold and delivered its property, and the defendants have paid it $25,000 for it. It seeks to recover $25,000 more, with interest, on the ground that the defendants agreed, not only to pay the $25,000 which they have paid, but also to give their promissory notes for $25,000 in addition, or, in effect, to pay $50,000 for the property. It is obvious that there can be no recovery here, and that the complaint states no cause of action unless it shows that there was an existing contract by the defendants to give these notes, and to pay $50,000 in all for the property when this action was commenced. When the complaint is read with this question in mind, its most striking feature is that it discloses an executed contract of sale between the plaintiff and the defendants of the property in question, for $25,000, which was made and performed between July 21, 1895, and August 29, 1895, and which is evidenced by the letter of the defendant Haskell of July 22, 1895, and the conveyance of the property and the surrender of the bonds which followed it, while, for the recovery it seeks, it counts on a contract between the same parties for the sale of the same property for $50,000, made between June 13 and June 17, 1895, more than a month before the second contract. It is unnecessary to determine whether or not Haskell's letter of July 22d, and the oral acceptance of Jackson, the president of the plaintiff, constituted a valid contract by the Housekeeper Company, whose specific performance could have been enforced in equity. However that may be, it is certain that this letter, its acceptance by Jackson, and the conveyances of the property, the surrender of the bonds upon it, and the payment and acceptance of the $25,000 which it fixed as the price of the property in strict accord with its terms, when taken together, made a valid contract of sale, which was completely performed by the parties, and all the terms of which were clearly expressed in the letter and the deeds. For convenience, this agreement will be called the "Contract of July 22d." Nor is it requisite to the determination of this case that we decide whether or not Jackson's letter of June 14th, in which he offered to use every personal endeavor to consummate a sale of the property for $25,000 in cash and $25,000 in promissory notes of the defendants, together with the acceptance of that proposition by the defendant Fayram, followed by the subsequent surrender on June 17th, and the destruction, of that acceptance, made or left in existence a legal contract between the parties for a sale of this property for $50,000. This question is susceptible to grave doubts. But for the purpose of this case we will concede, although we do not decide, that the letter of Jackson and the acceptance of Fayram made a lawful written contract between the plaintiff and the defendants for the sale of the property for $25,000 in cash and $25,000 in the notes of the defendants, and that this agreement was not abrogated or canceled by the surrender of Fayram's acceptance, and its subsequent destruction or suppression. For the sake of brevity, this agreement will be called

the "Contract of June 14th." We have, then, two contracts between the same parties for the sale of the same property,—the earlier for the sale for $25,000 in cash and $25,000 in notes, and the latter for $25,000 in cash, without any notes. What was the legal effect of the subsequent contract upon its predecessor? In the absence of fraud or mutual mistake,—and the complaint contains no allegations sufficient to sustain a charge of either,—there can be no doubt concerning the answer which ought to be given to this question, under the law. The later contract covers the entire subject-matter of the earlier one. It is complete in itself. It is inconsistent with the preceding contract. The two cannot stand together. There was but one sale of this property, and this sale could not have been for $50,000 and for $25,000 at the same time. A subsequent contract completely covering the same subject-matter, and made by the same parties, as an earlier agreement, but containing terms inconsistent with the former contract, so that the two cannot stand together, rescinds, supersedes, and is substituted for the earlier contract, and becomes the only agreement of the parties on the subject. Clark, Cont. 612; Patmore v. Colburn, 1 Cromp., M. & R. 65, 71; Chrisman v. Hodges, 75 Mo. 413, 415; Renard v. Sampson, 12 N. Y. 561, 568; Stow v. Russell, 36 Ill. 18, 30; Harrison v. Polar Star Lodge, 116 Ill. 279, 287, 5 N. E. 543, 546; Howard v. Railroad Co., 1 Gill, 311, 341; Paul v. Meservey, 58 Me. 419, 421. The legal effect of the contract of July 22d, therefore, standing by itself, was to rescind the agreement of June 14th, and to constitute itself the only contract between the parties for the sale of the property.

We turn again to the complaint to ascertain in what way the plaintiff seeks to escape from this effect. The only averments to accomplish that result are that at some time before the contract of July 22d was made the defendants advised the plaintiff that it would be necessary and prudent to conduct seeming negotiations for the purchase of the property, so that the transaction might be clothed with the appearance of genuineness, and assured it that this subsequent negotiation should be meaningless and of no validity, except as a mode of transferring the property, and that the only contract and transaction they desired to make was the contract of June 14th, and that, in furtherance of this plan, the contract of July 22d was made and fulfilled in part performance of the agreement of June 14th. The averment that the contract of July 22d was performed in part fulfillment of the agreement of June 14th must stand or fall with the sufficiency of the plea, that the later contract was meaningless and invalid, because, if it was valid, the transfer of the title and the payment of the $25,000 constituted its performance, and, if it was without legal effect or meaning, the contract of June 14th was in force, and the sale and delivery of the property were necessarily a part performance of that contract. The averments under consideration do not disclose any mutual mistake in making or reducing to writing or performing the agreement of July 22d, because they do not show that the defendants did not intend to make and perform that contract. They fail to

disclose any fraud, because the promises they recite relate to the future. They do not constitute the misrepresentation of any existing fact which conditioned the trade. And fraud may not be predicated of a promise or a prophecy. Railway Co. v. Barnes' Adm'x, 64 Fed. 80, 12 C. C. A. 48, and 27 U. S. App. 421; Sawyer v. Prickett, 19 Wall. 146, 163; Insurance Co. v. McMaster, 87 Fed. 63, 67, 30 C. C. A. 532, 535, and 57 U. S. App. 638, 644; Kerr, Fraud & M. (Bump's Ann. Notes) 85, note 3. It is not perceived how a contract to sell the property for $25,000 could clothe its sale with more appearance of genuineness than an agreement to sell it for $50,000, and the complaint discloses no reason why a sham written contract for a sale at the former price should be made, if the real intention of the parties was to perform a valid contract for a sale at the latter price. There is, however, a fatal objection to the allegations which are made to avoid the contract of July 22d. Those averments are, in effect, that in the parol negotiations which preceded and resulted in that written contract the defendants represented and promised that the subsequent agreement should have consequences exactly opposite to those which its plain terms and their settled legal effect entailed. The legal effect of this written contract was to rescind and supersede the former agreement, and to make the later one the only contract between the parties. The averments of the complaint are that, in the oral negotiations which led to it, the defendants represented to and assured the plaintiff that this contract should not have that effect, but that it should itself be void while the contract of June 14th should still remain in force. Such allegations as these are futile to avoid the deliberate written contract of the parties. No evidence can be received under them, because its admission would fly in the teeth of the salutary rules that all prior negotiations are merged in the written contract which results from them, and that parol evidence cannot be received to contradict or modify its terms or its legal effect. In Chrisman v. Hodges, 75 Mo. 413, 415, this exact question was presented to the supreme court of Missouri by an attempt to show by oral testimony that it was not the intention of the parties by a subsequent inconsistent contract to substitute that agreement for an earlier one, and the court unanimously held that this would be to permit parol evidence to contradict the terms and to destroy the legal effect of the later written contract, and that such evidence could not be lawfully received. The only testimony which could establish the truth of the averments in this regard falls under the ban of the established rule so often announced and applied in this court, that "no representation, promise, or agreement made, or opinion expressed, in the previous parol negotiations as to the terms or legal effect of the resulting written agreement, can be permitted to prevail, either at law or in equity, over the plain provisions and just interpretation of the contract, in the absence of some artifice or fraud which concealed its terms and prevented the complainant from reading it." Insurance Co. v. McMaster, 87 Fed. 69–71, 30 C. C. A. 538–540; Thompson v. Insurance Co., 104 U. S. 252, 259; Insurance Co. v. Henderson, 69 Fed.

762, 766, 768, 16 C. C. A. 390, 393, 395, 32 U. S. App. 536, 543, 547; Green v. Railway Co., 35 C. C. A. 68, 92 Fed. 873, 877; Laclede Fire-Brick Mfg. Co. v. Hartford Steam-Boiler Inspection & Insurance Co., 60 Fed. 351, 353, 358, 9 C. C. A. 1, 3, 8, 19 U. S. App. 510, 513, 520; Insurance Co. v. Mowry, 96 U. S. 544, 547; Assurance Co. v. Norwood, 57 Kan. 610, 611, 613, 47 Pac. 529; Association v. Kryder, 5 Ind. App. 430, 435, 31 N. E. 851; Union Nat. Bank of Oshkosh v. German Ins. Co., 18 C. C. A. 203, 71 Fed. 473; Insurance Co. v. Teter, 136 Ind. 672, 673, 676, 679, 36 N. E. 283; Burt v. Bowles, 69 Ind. 1; Clodfelter v. Hulett, 72 Ind. 137; Hudson Canal Co. v. Pennsylvania Coal Co., 8 Wall. 276, 290; Insurance Co. v. Lyman, 15 Wall. 664; Pearson v. Carson, 69 Mo. 550; Insurance Co. v. Neiberger, 74 Mo. 167; Lewis v. Insurance Co., 39 Conn. 100. The result is that there are no averments in the complaint sufficient to avoid the legal effect of the agreement of July 22d, and the earlier contract was rescinded by that agreement, so that there is no basis for a recovery here on account of the refusal of the defendants to make and deliver their notes.

This view of the legal effect of the transactions between these parties is confirmed by the practical interpretation which they gave to them by their acts. If the earlier contract was in force when they transferred the property, and the bonds secured upon it, the plaintiff was entitled to the notes at the same time that he received the cash, and as a condition of the transfer of the property and the bonds to the defendants. If that contract was in force, and the parties were performing it, the natural and usual course of business would have been for the plaintiff to retain the title of the property and the possession of the bonds until it received the notes of the defendants, and to exchange the conveyances of the property and the notes simultaneously. On the other hand, if the former contract was rescinded and the later agreement was in force, the payment of the $25,000 was the only condition, a compliance with which the plaintiff could require. The Housekeeper Company received the $25,000, delivered the title deeds, and surrendered the bonds, without demanding or mentioning the notes. All this was done before August 29, 1895. The demand of the notes seems to have been an afterthought. It was not made until October 25, 1895, nearly two months after the property was delivered to the defendants. These acts of the parties constituted a practical construction of their transaction to the effect that the earlier contract was rescinded and the later one was in force. They are in accord with the legal effect of their written contracts, and undoubtedly indicate their intention and understanding at the time the sale was consummated. The practical interpretation given to their agreements by the parties to them, while they are engaged in their performance, and before any controversy has arisen concerning them, is one of the best indications of their true intent, and courts that follow it will rarely go far astray. Schofield v. Bank, 97 Fed. 282; Topliff v. Topliff, 122 U. S. 121, 131, 7 Sup. Ct. 1057; Chicago v. Sheldon, 9 Wall. 50, 54. The judgment below is affirmed.